IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT GOMEZ and MARK MAURER, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　Plaintiffs,<br>　v.<br><br>PURE NOOTROPICS, LLC,<br><br>　　　　　　　　　Defendant. | Case No. 1:21-cv-03366<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

　　　　Plaintiffs Robert Gomez and Mark Maurer ("Plaintiffs"), by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge, against Defendant Pure Nootropics, LLC ("Defendant").

## NATURE OF THE ACTION

　　　　1.　　This is a class action lawsuit on behalf of purchasers of Defendant's products: Pure Nootropics Aniracetam, Pure Nootropics Oxiracetam, and Pure Nootropics Phenylpiracetam, (collectively, the "Products"), in the United States.

　　　　2.　　In general, "[o]ver-the-counter dietary supplements … marketed to improve memory and focus have become increasingly popular in the United States (US) with hundreds of millions in sales per year."[1]  Supplements that allegedly improve brain functioning are referred to as "nootropics."

---

[1] Pieter A. Cohen, et al., *Five Unapproved Drugs Found in Cognitive Enhancement Supplements*, Neurology Clinical Practice (Sept. 23, 2020).

1

3. Defendant is a manufacturer and supplier of several nootropics under its own label, Pure Nootropics, as referenced in Paragraph 1.

4. Defendant represents that the Products have meaningful effects on consumers' memory, learning, focus, energy, and overall mood.

5. Unfortunately for consumers, Defendant's claims and representations about the Products are false and unsupported by scientific evidence. The United States Food & Drug Administration ("FDA") has explicitly stated[2] to Defendant that analogs[3] of the Products are not recognized as safe and effective for the uses and claims made by Defendant.

6. Further, analogs of Defendant's Products were classified by the FDA as "drugs,"[4] which require FDA approval prior to the introduction and sale of said drugs into interstate commerce.

7. Defendant has not procured FDA approval prior to selling the Products, despite admonition by the FDA. Accordingly, the Products are "adulterated" and thus illegal to sell.

8. In addition, the Federal Trade Commission ("FTC") also admonished the Defendant, for making claims about its products which "may not be substantiated by competent and reliable scientific evidence."[5]

9. Plaintiffs are purchasers of Pure Nootropics who assert claims on behalf of themselves and similarly situated purchasers of Pure Nootropics for violations of the consumer

---

[2] William A Correll, Jr., Mary Engle, *Warning Letter*, U.S. Food & Drug Admin., U.S. Federal Trade Comm'n (Feb. 05, 2019) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/pure-nootropics-llc-565425-02052019.

[3] Pieter A. Cohen, et al., *Five Unapproved Drugs Found in Cognitive Enhancement Supplements*.

[4] William A Correll, Jr., Mary Engle, *Warning Letter*, U.S. Food & Drug Admin., U.S. Federal Trade Comm'n (Feb. 05, 2019) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/pure-nootropics-llc-565425-02052019.

[5] *Id.*

protection laws of New York, unjust enrichment, and breach of implied warranty of merchantability.

10. Plaintiffs assert two forms of economic injury on behalf of themselves and the putative Class: (i) that they would not have purchased the Products, or would have paid significantly less for them, had they known that the Products did not have the advertised effects on their memory, learning, focus, energy, and mood; and (ii) that the Products were worthless because they were "adulterated" and thus illegal to sell.

## PARTIES

11. Plaintiff Robert Gomez is a resident of Hempstead, New York who has an intent to remain there, and is therefore a domiciliary of New York. Plaintiff Gomez purchased approximately one bottle of Pure Nootropics Phenylpiracetam. Plaintiff Gomez purchased the bottle in-person at a CVS Pharmacy store. Plaintiff Gomez purchased said bottle due to a desire to improve cognitive function. In purchasing Pure Nootropics Phenylpiracetam, Plaintiff Gomez relied on Defendant's representations that Pure Nootropics Phenylpiracetam enhances "mental performance & brain support" as well as is a "great boost of mental energy." Had Plaintiff Gomez known that the Pure Nootropics Phenylpiracetam did not produce the advertised effects, Plaintiff Gomez would not have purchased Pure Nootropics Phenylpiracetam, or would have paid substantially less for the bottle. Further, had Plaintiff Gomez known that Pure Nootropics Phenylpiracetam contained unapproved ingredients and was thus adulterated and illegal to sell, Plaintiff Gomez would not have purchased the bottle of Pure Nootropics Phenylpiracetam at all. After using the Pure Nootropics Phenylpiracetam, Plaintiff Gomez felt no positive effects, specifically no improved "mental performance & brain support" and no "great boost of mental energy."

12. Plaintiff Mark Maurer is a resident of Rensselaer, New York who has an intent to remain there, and is therefore a domiciliary of New York. Plaintiff Maurer purchased approximately four bottles each of Pure Nootropics Aniracetam, Pure Nootropics Oxiracetam, and Pure Nootropics Phenylpiracetam, over a period of approximately four months. Plaintiff Maurer purchased the bottles each time in-person at a GNC store. Plaintiff Maurer purchased said bottes due to a desire to improve his fitness and recurring health issues. In purchasing the Products, Plaintiff Maurer relied on Defendant's representations that Pure Nootropics Aniracetam "improves memory formation," "improve(s) mental energy," and enhances "mood," while Pure Nootropics Oxiracetam enhances "memory and learning," "energy," and "mood," and Pure Nootropics Phenylpiracetam enhances "mental performance & brain support" and is a "great boost of mental energy." Had Plaintiff Maurer known that the Products did not produce their advertised effects, Plaintiff Maurer would not have purchased the Products, or would have paid substantially less for them. Further, had Plaintiff Maurer known that the Products contained unapproved ingredients and were thus adulterated and illegal to sell, Plaintiff Maurer would not have purchased the Products at all.

13. Defendant Pure Nootropics, LLC is a New Mexico limited liability company with its principal place of business in Albuquerque, New Mexico. Defendant markets, sells, and distributes the Products throughout the United States, including in the State of New York.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100

members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of states different than Defendant.

15. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within New York, such that Defendant has significant, continuous, and pervasive contracts with the State of New York.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and because Plaintiffs purchased and used Pure Nootropics Aniracetam, Pure Nootropics Oxiracetam, and Pure Nootropics Phenylpiracetam in this District.

## FACTUAL ALLEGATIONS

### I. The Products' Advertising Is Misleading

17. Nootropics are drugs or supplements that are claimed to improve cognitive function, including memory, focus, and other aspects of cognition in healthy individuals.

18. American consumers are spending more and more on nootropics each year. There is an increase in the number of individuals using nootropics for nonmedicinal purposes, such as improving performance at school or work.

19. Defendant advertises, markets, sells, and distributes its own line of nootropics, Pure Nootropics, throughout New York and the United States.

20. The Products can be purchased online at Defendant's website: www.purenootropics.net. The Products can also be purchased at major retailers such as GNC and CVS Pharmacy.

21. Pure Nootropics are available in two forms: powder and capsule. The powder is sold in measurements of grams, while the capsules are sold in measurements of milligrams.

5

22. The Products are sold at the following prices:

Pure Nootropics Aniracetam:

- $25.45 for 75g powder
- $65.95 for 200g powder
- $13.99 for 30 capsules
- $24.99 for 60 capsules

Pure Nootropics Oxiracetam:

- $14.95 for 30g powder
- $32.45 for 75g powder
- $16.99 for 30 capsules
- $29.99 for 60 capsules

Pure Nootropics Phenylpiracetam:

- $29.95 for 7.5g powder
- $49.95 for 15g powder
- $16.99 for 30 capsules

23. Defendant has consistently claimed and represented that consuming the Products will strengthen and/or improve consumers' memory, learning, focus, energy, and overall mood.

24. Indeed, all three of the Products can be found listed on Defendant's website, under the section "TOP NOOTROPICS FOR **MENTAL PERFORMANCE & BRAIN SUPPORT**."

25. Pure Nootropic Oxiracetam and Pure Nootropic Phenylpiracetam can both be found listed on Defendant's website, under the false and misleading section "TOP NOOTROPICS FOR **ENERGY.**"

26. Pure Nootropic Aniracetam and Pure Nootropic Oxiracetam can both be found listed on Defendant's website, under the false and misleading section "TOP NOOTROPICS FOR **MOOD.**"

27. Defendant's misrepresentations can also be seen on the 'KNOWLEDGE BASE' section of its website.[6] In this section of its website, Defendant states Aniracetam "improves memory formatting and learning," and "increases stimulation."

**Aniracetam**

This is the second most common racetam and it was discovered not long after piracetam. Aniracetam is a very fast acting nootropic that improves memory formation and learning, but also increases stimulation. Because it has a high bioavailability (meaning it absorbs quickly), it is fast acting and more potent than piracetam, but it requires more doses throughout the day.

For most people who are trying to improve mental energy, get some stimulation, and improve learning, aniracetam is a great choice. It is often used in addition to piracetam as part of a nootropic stack that is focused on racetams.

28. Likewise, this section of Defendant's website states Oxiracetam "can not only halt, but also reverse neurological decline," and is "useful for younger individuals who are seeking enhanced memory and learning."

**Oxiracetam**

Often considered one of the most potent racetams, oxiracetam has a long history of neuro protection. Many studies show that oxiracetam can not only halt, but also reverse neurological decline. Sometimes this can translate into reversing damage from trauma (whether chemical or physical) that people suffer earlier in life.

This cognitive enhancer has been studied for a variety of different cognitive functions. It is also useful for younger individuals who are seeking enhanced memory and learning. For most people, this is an advanced, but very safe nootropic addition.

---

[6] KNOWLEDGE BASE, https://www.purenootropics.net/knowledge-base/.

29. Finally, this section of Defendant's website states Phenylpiracetam is "a great boost of mental energy with the same memory enhancement benefits of the entire racetam family."

**Phenylpiracetam**

Considered 60 times more potent than piracetam, this nootropic is a great boost of mental energy with the same memory enhancement benefits of the entire racetam family. Phenylpiracetam is so stimulating, the olympic organizations have banned the substance for athletes, but that doesn't mean you cannot use it to your advantage!

As a highly potent nootropic, phenylpiracetam is also very bioavailable which means taking smaller doses more frequently is a good idea.

30. Defendant's representations are designed to induce consumers to believe that the Products have been proven as a matter of fact to strengthen consumers' memory, learning, focus, energy, and overall mood. And consumers purchase the Products for the purpose of obtaining these purported brain performance benefits.

31. However, Defendant's Products do not produce their advertised benefits.

32. A 2020 study published by the Neurology Clinical Practice[7], a journal of the American Academy of Neurology, examined nootropic products that contained four ingredients, classified as "piracetam analogs." Three of these four piracetam analogs were: "Aniracetam," "Oxiracetam," and "Phenylpiracetam" (which the Defendant's Products at issue stem from). The study found that "[u]se of these cognitive enhancement supplements poses potentially serious health risks given the unpredictable dosing and lack of clinician supervision. The risks of using specific products is not known, although these drugs have been associated with adverse effects

---

[7] Pieter A. Cohen, et al., *Five Unapproved Drugs Found in Cognitive Enhancement Supplements*.

including increased and decreased blood pressure, insomnia, agitation, dependence, sedation, hospitalization and intubation."[8]  Moreover, the study also noted that "supplements marketed as cognitive enhancement products may contain unpredictable combinations of unapproved drugs."[9]

33.     In addition, on February 5, 2019, the FDA and the FTC issued a joint-warning letter[10] to Defendant concerning seven of the Defendant's supplements, including piracetam.  As previously mentioned in the 2020 study, Aniracetam, Oxiracetam, and Phenylpiracetam are all "analogs of piracetam."[11]  The FDA stated in the warning letter that Defendant's piracetam product was not recognized as safe and effective for the uses and claims made by Defendant.

34.     Moreover, the FTC stated in the warning letter that it was "concerned that one or more of the efficacy claims … may not be substantiated by competent and reliable scientific evidence."  Due to this concern, the FTC warned Defendant to "review all claims for your products *and ensure that those claims are supported by competent and reliable scientific evidence*."  (Emphasis added).

35.     Finally, the FDA sent a separate warning letter to a rival nootropics company, Peak Nootropics,[12] in which the FDA stated that Peak Nootropics Aniracetam, Peak Nootropics Oxiracetam, and Peak Nootropics Phenylpiracetam were not recognized as safe and effective for

---

[8] *Id.*

[9] *Id.*

[10] William A Correll, Jr., Mary Engle, *Warning Letter*, U.S. Food & Drug Admin., U.S. Federal Trade Comm'n (Feb. 05, 2019) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/pure-nootropics-llc-565425-02052019.

[11] Pieter A. Cohen, et al., *Five Unapproved Drugs Found in Cognitive Enhancement Supplements*.

[12] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/peak-nootropics-llc-aka-advanced-nootropics-557887-02052019.

the uses and claims made by Peak Nootropics, claims that were materially similar to the claims made here by Defendant.

36. Despite all this, Defendant knowingly continues to sell the Products to consumers with unsupported and unauthorized claims, thereby misleading consumers to believe that the Products do, in fact, have meaningful effects on consumers' memory, learning, focus, energy and overall mood.

37. Therefore, Defendant's claims and representations, as well as advertising of the Products, are false and misleading.

## II. The Products Are Illegally Distributed And Misbranded Under Federal Law

38. As referenced above, the FDA has taken note of Defendant's claims and representations of its piracetam product, which the Products are analogs of, and determined in a warning letter issued on February 5, 2019, that the piracetam product is in fact classified as a drug. 21 U.S.C. § 321(g)(1)(B).

39. Also referenced above, the FDA sent a warning letter to a rival nootropics company, Peak Nootropics, in which the FDA stated that Peak Nootropics Aniracetam, Peak Nootropics Oxiracetam, and Peak Nootropics Phenylpiracetam should all be classified as drugs, which would require FDA testing and approval prior to the legal selling of said products in interstate commerce.

40. The FDA approves new drugs "on the basis of scientific data and information demonstrating that the drug is safe and effective."[13] To this date, however, the Products have not

---

[13] William A Correll, Jr., Mary Engle, *Warning Letter*, U.S. Food & Drug Admin., U.S. Federal Trade Comm'n (Feb. 05, 2019) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/pure-nootropics-llc-565425-02052019.

been tested or approved by the FDA. Accordingly, Defendant's selling of the Products continues to violate the Federal Food, Drug, and Cosmetic Act.

41. Furthermore, Defendant continues to be in violation of 21 U.S.C. § 331(a), namely the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

42. The Warning Letter states that Defendant's supplements, including piracetam "fail to bear adequate direction for their intended uses and, therefore, the products are misbranded." Thus, the Defendant has been, and continues to illegally sell the misbranded drugs to consumers.

43. Moreover, the FDA stated that the reason why Defendant's piracetam product was classified as a drug was because the piracetam product was not recognized as safe and effective for the uses and claims made by the Defendant.

44. Based on the foregoing, Defendant's Products are illegal to sell because they are analogs of unapproved "new drugs" and are thus "adulterated" and "misbranded." Such illegally sold products are worthless and have no value. *See Debernadis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019).

## CLASS ALLEGATIONS

45. Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products (the "Class"). Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased the Products for resale. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

11

46. Plaintiffs also seek to represent a subclass consisting of Class members who reside in New York (the "Subclass").

47. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class and Subclass may be expanded or narrowed by amendment or amended complaint.

48. **Numerosity.** The members of the Class and Subclass are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiffs reasonably estimate that there are thousands of members in the Class and Subclass. Although the precise number of Class members is unknown to Plaintiffs, the true number of Class members is known by Defendant and may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

49. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to:

   (a) whether Defendant's labeling, marketing, and promotion of the Products is false and misleading;

   (b) whether Defendant's conduct was unfair and/or deceptive;

   (c) whether Plaintiffs and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

50. With respect to the Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendant violated New York's General Business Law § 349, Deceptive Acts and Practices Unlawful, as well as General Business Law § 350, False Advertising.

51. **Typicality.** The claims of the named Plaintiffs are typical of the claims of other members of the Class in that the named Plaintiffs were exposed to Defendant's false and misleading marketing, purchased the Products, and suffered a loss as a result of that purchase.

52. **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class and Subclass because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class and Subclass.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class or Subclass.

53. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and Subclass members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for the Class or Subclass on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if Class or Subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the

benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## COUNT I
### Violation of New York Gen. Bus. Law § 349

54. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

55. Plaintiffs bring this claim individually and on behalf of the members of the New York Subclass against Defendant.

56. By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by making false representations regarding its Products.

57. The foregoing deceptive acts and practices were directed at consumers.

58. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent that the Products strengthen consumers' memory, learning, focus, energy, and overall mood.

59. The foregoing deceptive acts and practices are also misleading in a material way because they represented that the Products were not adulterated, misbranded, and were legal to sell.

60. Plaintiffs and members of the New York Subclass were injured as a result of Defendant's deceptive acts and practices because (a) they would not have purchased the Products if they had known that the Products would not strengthen consumers' memory, learning, focus, energy, and overall mood, and (b) they overpaid for the Products on account of Defendant's misrepresentations that the Products strengthen consumers' memory, learning, focus, energy, and overall mood.

61. Plaintiffs and members of the New York Subclass also were injured as a result of Defendant's deceptive acts and practices because (a) they would not have purchased the Products if they had known that the Products were adulterated, misbranded, and illegal to sell, and (b) they overpaid for the Products on account of Defendant's misrepresentations that the Products were not adulterated, misbranded, and illegal to sell.

62. The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent that the Products strengthen consumers' memory, learning, focus, energy, and overall mood.

63. The foregoing deceptive acts and practices are also misleading in a material way because they fundamentally misrepresent that the Products are not adulterated, misbranded, and illegal to sell.

64. On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorney's fees.

## COUNT II
### Violation of New York Gen. Bus. Law § 350

65. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

66. Plaintiffs bring this claim individually and on behalf of the members of the New York Subclass against Defendant.

67. Based on the foregoing, Defendant engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law by misrepresenting the benefits of the Products.

68. The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

69. These misrepresentations have resulted in consumer injury or harm to the public interest.

70. Defendant alone possessed the knowledge that the Products were not effective, and were adulterated, misbranded, and illegal to sell.

71. As a result of Defendant's misrepresentation, Plaintiffs and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the Products if they had known that the Products would not strengthen consumers' memory, learning, focus, energy, and overall mood, and (b) they overpaid for the Products on account of Defendant's misrepresentations that the Products strengthen consumers' memory, learning, focus, energy, and overall mood.

72. As a result of Defendant's misrepresentation, Plaintiffs and members of the New York Subclass have also suffered economic injury because (a) they would not have purchased the Products if they had known that the Products were adulterated, misbranded, and illegal to sell, and (b) they overpaid for the Products on account of Defendant's misrepresentations that the Products were not adulterated, misbranded, and illegal to sell.

73. On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorney's fees.

## COUNT III
### Unjust Enrichment

74. Plaintiffs hereby incorporate by reference the allegations contained in all proceeding paragraphs of this complaint.

75. Plaintiffs bring this claim individually and on behalf of members of the Class and New York Subclass against Defendant.

76. Plaintiffs and Class members conferred benefits on Defendant by purchasing Pure Nootropics Products.

77. Defendant has knowledge of such benefits.

78. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of Pure Nootropics Products. Retention of moneys under these circumstances is unjust and inequitable because Defendant misrepresented that Pure Nootropics Products would strengthen consumers' memory, learning, focus, energy, and overall mood.

79. Retention of those moneys under these circumstances is also unjust and inequitable because the Pure Nootropics Products were adulterated, misbranded, and illegal to sell.

80. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT IV
### Breach of Implied Warranty

81. Plaintiffs hereby incorporate by reference the allegations contained in all proceeding paragraphs of this complaint.

17

82. Plaintiffs bring this claim individually and on behalf of members of the Class and New York Subclass against Defendant.

83. Defendant, as the marketer, distributor, and/or seller, impliedly warranted that the Pure Nootropics Products (i) were not adulterated products, and thus legal to sell, and (ii) were proven as a matter of fact to strengthen consumers' memory, learning, focus, energy, and overall mood.

84. Defendant breached the warranty implied in the contract for the sale of the Pure Nootropics Products because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the Products manufactured, distributed, and sold by Defendant were adulterated, and as such illegal to sell, as well as not proven to strengthen consumers' memory, learning, focus, energy, and overall mood. As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

85. Plaintiffs and Class members purchased the Pure Nootropics Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

86. The Pure Nootropics Products were not altered by Plaintiffs or Class members.

87. The Pure Nootropics Products were defective when they left the exclusive control of Defendant.

88. Defendant knew that the Pure Nootropics Products would be purchased and used without additional testing by Plaintiffs and Class members.

89. The Pure Nootropics Products were defectively manufactured and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

90. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because they would not have purchased the Pure Nootropics Products if they knew the truth about the Products and that the Products they received were worth substantially less than the Products they were promised and expected.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and New York Subclass and Plaintiffs' attorneys as Class Counsel to represent the Class and New York Subclass members;

(b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs, the Class, and the New York Subclass on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest in all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

(h) For an order awarding Plaintiffs and the Class and New York Subclass their reasonable attorney's fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: June 15, 2021                             Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
         Max S. Roberts

Max S. Roberts
888 Seventh Avenue, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Rachel L. Miller (*Pro hac vice* app. forthcoming)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: rmiller@bursor.com

*Attorneys for Plaintiffs*